**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

UNITED STATES OF AMERICA

       Plaintiff,

v.                              CASE NUMBER:  2:14-CR-71

SAMUEL L. BRADBURY

       Defendant.

**DEFENDANT'S MOTION TO DISMISS
THE INDICTMENT**

Comes now the Defendant, Samuel L. Bradbury, through counsel and files this *Motion to Dismiss the Indictment* to ensure protection of his rights under the First Amendment of the United States Constitution. In support of this motion, the Defendant states the following:

**I. Introduction**

Free expression is valued as a fundamental individual right and as fundamental to our system of government. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982). "Speech concerning public affairs is more than self-expression; it is the essence of self-government" and thus "[t]here is a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open." *Id.* (internal quotations removed). Particular attention is paid to any prohibition that constricts pure speech or speech at the core of the First Amendment—political speech. *Texas v. Johnson*, 491 U.S. 397, 406, 411 (1989).

In this case Mr. Bradbury is charged under 18 U.S.C. §844(e) with willfully threatening the use of fire or an explosive. (DE 14). This statute has an

unconstitutionally overbroad reach beyond the category of permissibly outlawed true threats. *See Sect. III.A infra*. The statute targets speech that causes no injury through the very act of stating the words, and which has little effect other than causing offense. *Id*. Protected, although perhaps unrefined, political speech is as a result impermissibly chilled by the wide breadth of this statute and by the prosecution in this case. *Id*.

The fantastical and hyperbolic statements in this case, which describe impossible and unrealistic acts, also cannot be interpreted as true threats as a matter of law. *See Sect. III.B infra*. Because these statements are a crude form of political hyperbole that cannot be the basis for prosecution given the protections of the First Amendment, Mr. Bradbury moves for dismissal of the Indictment.

## II. Background

Samuel Bradbury is a 22-year-old male who resides with his parents in Pine Village, Indiana. On June 19, 2014 Mr. Bradbury posted a statement on his Facebook page that has become the basis for this prosecution. (DE 1 at Attachment 1, p. 2) (*Probable Cause Affidavit*, hereinafter "PC"). The statement outlines a scenario in which a group, the 765 Anarchists among which Mr. Bradbury states his membership, will use violence to "purge the vile pig scum from this land and restore constitutional rights to the people." (PC, 2-4)[1]. The statement refers to "extreme damage" to police equipment and "incinerat[ing] and destroy[ing]" and "blow[ing] to pieces" the local courthouse and specific judges who may be in that courthouse. (PC, 3). The post continues to use extreme statements about suicide, chaos and causing serious damage and asks "Call us

---

[1] The full post is included in the *Probable Cause Affidavit*.

crazy, call us killers, call us heroes and patriots." (PC, 3-4). The posting concludes stating "FREE SPEECH EXERCISE FOOLS". (PC, 4).

Two days later, on June 21, 2014, the West Lafayette Police Department was informed of Mr. Bradbury's post. (PC, 2). The police searched Mr. Bradbury's home on that same date. (PC, 4).

Mr. Bradbury was charged by Complaint on June 24, 2014 with "willful[ly] threaten[ing] the use of explosive materials". (DE 1). He is now charged by Indictment under 18 U.S.C. §844(e) with "through use of the internet . . . willfully ma[king] a threat to kill" parties listed in the Facebook posting and with threating to "unlawfully damage or destroy" the listed property "all by means of thermite, an incendiary device." (DE 14).

## III. Argument

### A. Section 844(e) proscribes language that does not aim to or actually affect any private or public activity and is therefore overbroad on its face and as applied in Mr. Bradbury's case.

Section 844(e) is an overbroad law unanchored by its seeming origin, historical proscription of true threats that aim to cause private or public disruption by the very utterance of the threat. *Compare* §844(e) *to Watts v. United States*, 394 U.S. 705, 707 (1969); *Virginia v. Black*, 538 U.S. 343, 365-66 (2003). Freedom to speak ideas, whether useful or distasteful, is central to the makeup of our democracy. *Claiborne*, 458 U.S. at 913; *Johnson*, 491 U.S. at 414. Words can only be outlawed to prevent injury imposed by the very use of expression, not disgust for underlying acts proposed by that speech, and only within categories previously identified by the Supreme Court based on our history and experience with those categories of speech. *See Black*, 538 U.S. at 359, 361-62. While bans on true threats comprise one of these identified categories, a statute is not within the true threat exception to the First Amendment simply because it

regulates threatening language; instead proscription of true threats has been sustained only when stating the threat affects private or public activity. *Watts*, 394 U.S. at 706-707; *Black*, 538 U.S. at 365-66. Lacking any requirement that a speaker intend to affect or reach any party who may reasonably be affected by his words, §844(e) reaches beyond the tolerance of the First Amendment aligning not with the tradition of permissible threat statutes but aiming instead at speech found distasteful.

> i. **True threats can be proscribed under the First Amendment only when regulation is limited to speech that causes the type of injury that has historically resulted in regulation of true threats.**

Eighteen U.S.C. §844(e) regulates pure speech based on its content and must be tested against the First Amendment's guarantee that no law will be passed "abridging the freedom of speech". U.S. CONST. AMEND. I. No activity aside from the use of words is necessary to trigger prosecution: under this statute, a crime is complete whenever a person uses a means of interstate commerce to "willfully make[ ] any threat, or maliciously convey[ ] false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive". 18 U.S.C. §844(e).

A content-based regulation of speech will survive First Amendment scrutiny only when it regulates a historically proscribed category of speech and is tailored to ensure that there is a "direct causal link between the restriction imposed and the injury prevented." *United States v. Alvarez*, 132 S. Ct. 2537, 2544, 2549 (2012). A statute is facially overbroad under the First Amendment when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate

4

sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). These regulations are "presumptively invalid and the Government bears the burden to rebut the presumption." *Stevens*, 559 U.S. at 468 (internal quotations omitted); *Alvarez*, 132 S. Ct. at 2544. Certain narrow categories of expression, such as "advocacy intended, and likely, to incite imminent lawless action . . . obscenity . . . [and] defamation", result in historically identified harms of a magnitude that permits exception to the general protection of speech. *Alvarez*, 132 S. Ct. at 2544. These are words "which by their very utterance inflict injury or tend to incite an imminent breach of peace." *Black*, 538 U.S. at 359. "True threats" fall into this list of narrow categories. *Id.* at 359-60.

Any statute proscribing true threats, however, must regulate that speech for "the very reasons why the particular class of speech at issue . . . is proscribable." *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 393 (1992); *see also Black*, 538 U.S. at 361-62. That is, the history of experience with a particular category of speech and the particular injury that stems from "their very utterance" must underlie any new regulation of that same type of speech. *Black*, 538 U.S. at 359. Thus, regulation of statements as true threats must target only those injuries historically identified as resulting from the utterance of a true threat. *Black*, 538 U.S. at 361-62. If a statute reaches speech that does not cause those historical injuries, its reach is overbroad. *See id.* at 359, 365. A review of the Supreme Court's jurisprudence in this area, as outlined below, reveals the "reasons why" true threats are "proscribable": because true threats that are delivered with an intent or in a context that cause disruption of private or public activity cause injury by their very utterance. *R.A.V.*, 505 U.S. at 377; *Black*, 538 U.S. at 363; *Watts*, 394 U.S. at 707. Comparing §844(e) to the narrow reasoning underlying previously upheld threat statutes reveals its overbreadth.

The expansive sweep of §844(e), that encompasses any threat to use fire or an explosive against "any individual" or "any building . . . or . . . property", has no direct causal link to preventing the type of injuries historically identified as stemming from threats against the President of the United States. *See Watts*, 394 U.S. at 706-707. In *Watts*, the Supreme Court's seminal "true threat" decision, the Court noted the unique concerns raised by serious threats made against our central government figure and the disruption to government functions very likely entailed with such speech. *Id.* at 707. Shielding this figure from threats of violence is viewed as necessary to maintaining his efficacy, which is central to maintaining efficacy of the government. *Id.* Even if no threat is carried out, statements of serious threats against the head of government undermine stability and confidence in the government and for those reasons such statements have been criminalized dating back to the 15th Century. *Id.* at 709 (Douglas, J., concurring); *see also Rogers v. United States*, 422 U.S. 35, 47 (1975) (Marshall, J., concurring) (noting that the reason for proscribing threats against the President include that the statement itself "may still restrict the President's movements and require a reaction from those charged with protecting the President"). These concerns do not support a wide prohibition on threats against any individual or any property.

Neither is §844(e) limited to statements made with any "intent to intimidate", a requirement that would link its proscription to the injuries identified as stemming from true threats uttered against private individuals. *Compare* §844(e) *to Black*, 538 U.S. at 363. In *Black*, the Court held that the State of Virginia may permissibly prohibit cross-burnings, a form of symbolic speech implicating the First Amendment, only when the prohibition is limited to cross-burnings done for the sake of intimidation. *Id.* at 365-66. "Intimidation in the constitutionally proscribable sense of the word is a type of true

threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 359. The disruption and effect on individual activity that stem from the intimidating statement, even without any additional violence actually performed against that individual, permit proscribing this speech. *Id.* Proscribing cross-burnings performed for other purposes strays from the reasons for proscribing threats and "would create an unacceptable risk of the suppression of ideas." *Id.* at 365 (internal quotations omitted). Acknowledging that cross-burnings may "arouse a sense of anger or hatred" even when not directed with a specific intent to intimidate, the Court rejected avoidance of this general reaction as a justification for a broader ban on expression. *Id.* at 367.

No language in §844(e) limits its reach to words spoken in a context that will result in these previously identified injuries or that "by their very utterance inflict injury" at all. *Compare* §844(e) *to Black*, 538 U.S. at 359. Section 844(e) has no requirement that the speaker have any intent to intimidate or influence any other party or to cause public disruption. *See* §844(e). The statute does not even minimally contain a requirement that the threat be conveyed to any party who could be so influenced. *Id.* A threat subject to prosecution under §844(e) may be spoken between two private parties without any likelihood that the statements will ever reach the threatened individual or influence any use of another's property. *See, e.g., United States v. Parr*, 545 F.3d 491, 495-96 (7th Cir. 2008) (defendant was prosecuted for threats against a federal building made in private to a fellow inmate without indication of an intent to convey the statements to any other party).

The lack of contextual limitation on the statements in §844(e) parallels the breadth of the false statements statute invalidated in *Alvarez* that also suffered from a

7

failure to link the regulation to the historically identified harms of the relevant speech category. 132 S. Ct. at 2547, 2551. In *Alvarez*, the government sought to prohibit any false statement by an individual wrongfully claiming to have received military decoration. *Id.* at 2543. The statute applied on its face to public declarations as well as "to personal, whispered conversations within the home" without regard to "the purpose" of the declaration. *Id.* at 2547. Historical regulation of false statements was permitted only in cases where the utterance of the statement caused the injuries of "defamation, fraud or some other legally cognizable harm associated with the false statement." *Id.* at 2545. The larger prohibition in *Alvarez* applied "in almost limitless times and settings" and failed to ensure that the speech reached by the statute was linked to the purposes of permitting proscription of false statements. *Id.* at 2547-48. Section 844(e) similarly lacks any time or setting limitation, and accordingly is similarly unmoored from the harms of impermissible influence and public disruption that historically underlie prohibitions of true threats. *Compare Watts*, 394 U.S. at 709; *also Black*, 538 U.S. at 359.

Nothing focuses the statute on the reasons for prohibiting true threats—the concern that stating the threat itself will interfere with an individual's or the public's activity. *See* §844(e).

### ii. Review of similar state statutes reveals the unprecedented reach of §844(e).

The breadth of the federal statute is revealed by comparison to similar state statutes; whether addressing threats against public officials or private parties, these state statutes tie their restrictions to the effect on or attempt to affect another party's actions. For example, several states criminalize threats conveyed to a party "with the

intent to . . . [i]nfluence the performance of any act or omission" of that party. FLA. STAT. §838.021(1) ("Corruption by threat against public servant"); *also* IND. CODE §35-45-2-1 (prohibiting threats if communicated "to another person, with the intent . . . that the other person engage in conduct against the other person's will"); WIS. STAT. §943.30 (prohibiting threats made "with the intent to compel the person so threatened to do any act against the person's will or omit to do any lawful act"); COL. REV. STAT. §18-8-306 (criminalizing threats made "with the intent thereby to alter or affect the public servant's . . . action"); D.C. CODE §22-851 (prohibiting threats that "intimidate[ ], impede[ ], interfere[ ] with . . . the performance" of a public official's duties); MASS. GEN. LAWS ch. 119A §2A (prohibiting threats that "attempt[ ] to intimidate or impede an officer or employee of the commonwealth acting in an official capacity"); MONT. CODE ANN. §45-7-102 (prohibiting threats "with the purpose to influence the person's decision . . . or other exercise of discretion as a public servant"); OHIO REV. CODE ANN. §2921.03 (prohibiting threats that "attempt to influence . . . a public servant . . . in the discharge of the person's duty"); 18 PA.C.S.A. §4702 (prohibiting threats made "with the intent to influence" the decision of a public official); W. VA. CODE §61-5A-5 (it is unlawful to "threaten harm to another with intent to influence the official action of a public servant").

Some states specify as an element of the offense that the threat be conveyed "directly or indirectly" to the party sought to be influenced. 720 ILCS 5/12-9 (unlawful if a threat is "convey[ed], directly or indirectly, to a public official . . . because of any other factor related to the official's public existence"); R.I. GEN. LAWS §11-42-4 (same); *see also* S.C. Code Ann. §16-3-1040 (prohibiting threats "knowingly and willfully deliver[ed] or convey[ed] to a public official"). This element is a de facto requirement in state

statutes that criminalize threats made with "the intent to terrorize another person, or . . . in reckless disregard of the risk of causing such terror." CONN. GEN. STAT. §53a-62; *also* ME. REV. STAT. ANN. tit. 17-A §210 (prohibiting threats when "the natural and probable consequence" is "[t]o place the person to whom the threat is communicated or the person threatened in reasonable fear that the crime will be committed").

State prohibitions of threats against property are normally limited to statements made to disrupt the occupancy of those spaces. IND. CODE §35-45-2-1(1)(a)(3) (prohibiting threats against property that cause evacuation or "interfer[e] with the occupancy" of the property); GA. CODE ANN. §16-11-37(a) (prohibiting threats made with the purpose of causing evacuation or "serious public inconvenience"); KY. REV. STAT. ANN. §508.080(1)(b) (prohibiting threats made for "the purpose of causing evacuation"); ME. REV. STAT. ANN. tit. 17-A §210(1)(B) (prohibiting threats made to cause evacuation or cause occupants to stay in a designated area); N.J. STAT. ANN. §2C:12-3(a) (prohibiting threats made with the purpose of causing evacuation or "serious public inconvenience"). In contrast, §844(e) has no requirement that any statement even be conveyed to a party with any association to the threatened property. *See* §844(e).

The "sweeping [and] unprecedented reach" of this federal threat statute fails to ensure that there is a "direct causal link between the restriction imposed and the injury prevented." *Alvarez*, 132 S. Ct. at 2547, 2549.

### iii. The potential for social benefits from regulation under §844(e) is an insufficient consideration to sustain the statute under the First Amendment.

The limitation that proscriptions of speech must be based in historically identified injury does not permit "an ad hoc balancing of relative social costs and

benefits." *Stevens*, 559 U.S. at 470; *see Black*, 538 U.S. at 362; *R.A.V.*, 505 U.S. at 393. Attempts to broaden regulation to utilize "[s]uppression of speech as an effective police measure is an old, old device, outlawed by our Constitution." *Watts*, 394 U.S. at 712 (Douglas, J., concurring).

Further, the attempt to broaden regulation under this statute, by banning threats never conveyed to the threatened party, only questionably serves any social benefit. An individual who speaks his thoughts of using fire or an explosive to another individual in private, when the second person is not a target of the statement, does little more to cause fear or public disruption than he would if he wrote the threat in a private journal. Yet investigation is more likely facilitated if he is encouraged to share his plans with another person who may inform law enforcement. If his plans are sufficiently concrete, law enforcement may still prevent violence under prosecution for attempted criminal activity; if not, police may continue to monitor the situation or may unearth that the plan was never real. A shortcut law enforcement mechanism that relies on statements of a threat alone punishes no harm that stems from the words themselves but simply runs around the First Amendment.

> iv. **The prosecution in this case that reaches political speech not alleged to include any intent to cause nor resulting in disruption violates the protections of the First Amendment and must be dismissed.**

The facial overbreadth of §844(e) results in an overbroad application in this case in which Mr. Bradbury is being prosecuted for statements that were never conveyed to any party whose actions would reasonably be affected. Mr. Bradbury posted his statements on a private Facebook page that was available only to Facebook contacts of Mr. Bradbury. (*See* PC, 2). There is no allegation that Mr. Bradbury attempted to send

11

his statements to any of the parties named in the posting or to any party responsible for overseeing the mentioned property. (*See* DE 14). The allegations lack any claim that Mr. Bradbury made his statements with the intent to influence the actions of any other person. (*See* DE 14). Speaking these words perhaps caused offense, but this prosecution does not address any additional harms that stem from the statement itself.

The Supreme Court recognized in *Black* that allowing proscription of threatening acts not made for the purposes underlying historical prohibitions carries too great a risk that political speech will be limited; those same concerns arise in this case in which speech outlining acts of violence as a means of "restor[ing] constitutional rights to the people" are the basis for the instant prosecution. *Black*, 538 U.S. at 367; (PC, 4). Particular caution is necessary in this case because speech "advocating violent means to effect political and economic change" is among the core speech protected under the First Amendment. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also Johnson*, 491 U.S. at 411 (political speech is the core of the First Amendment). Attempts to outlaw speech on the basis that violent statements alone affect the "security of the State" have been "thoroughly discredited" as a permissible form of prohibition in the face of the First Amendment. *Brandenburg*, 395 U.S. at 447. Yet, without any link between the statements in this case and any improper influence on another person's activity or public disruption, little other reasoning for this prosecution exists aside from this general fear of an effect on security.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414 (discussing the First Amendment protections of acts of flag burning). Our commitment to diversity of

thought entails acceptance of ideas that even a majority of the populations finds "valueless or unnecessary." *Alvarez*, 559 U.S. at 471 (discussing First Amendment protections of depictions of harm to animals). Importantly, the First Amendment protects "social, economic and political doctrine which a vast majority of [our] citizens believes to be false and fraught with evil consequence." *Black*, 538 U.S. at 358 (internal quotations removed). Political criticism and free expression are unacceptably implicated by §844(e)'s breadth, which aims not at the reasons historically recognized for proscribing true threats but instead "chills constitutionally protected political speech". *See Black*, 538 U.S. at 365.

The facial overreach of §844(e) and the allegations in this prosecution require that this Court dismiss the charges against Mr. Bradbury as an unconstitutional restriction of his freedom of speech guaranteed by the First Amendment.

> **B.     The statements in this case are protected political rhetoric and cannot be considered true threats as a matter of law.**

Mr. Bradbury was engaging in protected political speech when posting the statement involved in this case on Facebook, and accordingly the statement cannot serve as the basis for prosecution as a matter of law. *Watts*, 394 U.S. at 708. The impossibility of his claim to target a judge who does not preside in the named courthouse, improbability of his broad claims to incinerate and destroy various property and generally farfetched language taken in context with the statement's advocacy of restoring constitutional rights cannot be interpreted as a true threat, but only as "a very crude offensive method of stating political opposition" to the local criminal justice and law enforcement systems. *Compare* (PC, 2-4) *to Watts*, 394 U.S. at 708.

Threat statutes are interpreted to require that the prosecuted statements must convey "true threats" in order to comply with the First Amendment. *Watts*, 394 U.S. at 708; *United States v. Parr*, 545 F.3d 419, 497 (7th Cir. 2008). Section 844(e)'s reference to "any threat" must therefore be limited to "true threats". *See, e.g., United States v. Leaverton*, 835 F.2d 254, 256 (10th Cir. 1987) (considering whether the evidence was sufficient to find that the defendant had made a true threat under §844(e)); *see Parr*, 545 F.3d at 497 (applying true threats analysis to 18 U.S.C. §2332 involving threats to use a weapon of mass destruction). A statement is a true threat "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. "[I]dle or careless talk, exaggeration or something said in a careless manner" is not a true threat. *Parr*, 545 F.3d at 497.

Courts are careful to distinguish political speech, even "crude offensive method[s] of stating political opposition", from statements subject to prosecution. *Watts*, 394 U.S. at 708. "The right to . . . maintain[ ] our institutions and resist[ ] their physical overthrow does not include intolerance of opinions and speech that cannot do harm although opposed and perhaps alien to dominant, traditional opinion." *Dennis v. United States*, 341 U.S. 494, 548 (1951). Advocacy, including violent rhetoric, cannot be limited by the government through criminal prosecution. *Noto v. United States*, 367 U.S. 290, 297 (1961); *Brandenburg*, 395 U.S. at 447; *see also Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1014 (7th Cir. 1984) (Judge Posner noting as follows: "If . . . a newly organized group of white supremacists vowed to take revenge on Chicago for electing a black mayor, these statements, made by groups with no 'track record' of violent acts, might well be privileged. . . . Or suppose the leaders of a newly formed

organization of Puerto Rican separatists went around Chicago making speeches to the effect that, if the United States does not grant Puerto Rico independence soon, it will be necessary to begin terrorist activities on the mainland United States. These speeches could not, in all probability, be made the basis of a prosecution."). The appropriate subjects of a threat statute must therefore be separated from statements of "political hyperbole". *Watts*, 394 U.S. at 708.

To ensure this protection of the First Amendment's guarantees, if a statement is found to be protected speech, therefore not a true threat as a matter law, the issue should be resolved without submission to a jury. *Watts*, 394 U.S. at 708 (finding that as a matter of law the petitioner's statements were "political hyperbole" that did not fit "within the statutory term" threat). A jury does not "decide a question of the application of the First Amendment" because the scope of "the protection against conviction afforded by the First Amendment is a matter of law." *Dennis*, 341 U.S. at 513. If from the words and context it is apparent that a party is engaging in protected speech, rather than an unprotected true threat, this issue should be resolved prior to trial. *Watts*, 394 U.S. at 708; *Planned Parenthood v. American Coalition*, 290 F.3d 1058, 1068 (9th Cir. 2002) (noting that issue of whether speech constituted "true threat" for purposes of § 871 is a question for the trier of fact except in those "few cases [that] may be so clear that they can be resolved as a matter of law"). This is necessary to avoid broadening the scope of a threat statute which would carry the "substantial risk of conviction for a merely crude or careless expression of political enmity." *Rogers*, 422 U.S. at 44 (Marshall, J., concurring).

The words and context of their delivery in the instant prosecution are not serious expressions of intent; they describe impossible and unrealistic acts as an exercise of

protected political speech and therefore may not be the basis of a criminal prosecution as a matter of law. First, the words themselves are statements that "advocate or teach the duty, necessity, or propriety of violence as a means of accomplishing industrial or political reform" and this hyperbolic advocacy is a form of protected speech. *Brandenburg*, 395 U.S. at 448-49. The Facebook posting outlines acts of violence in the face of displeasure with the criminal justice system and law enforcement as a means of "restor[ing] constitutional rights to the people." (PC, 4). Nothing in the statement "is directed to inciting or producing imminent lawless action", *Brandenburg*, 395 U.S. at 447, but instead outlines an outrageous scenario more aptly described to espouse "mere doctrinal justification for forcible overthrow." *Noto*, 367 U.S. at 297. Importantly, the posting itself explains the lack of serious intent by the inclusion of an explanation that the statements are part of a free speech exercise concluding with the line "FREE SPEECH EXERCISE FOOLS". (PC, 4). The outrageous plan described in the posting is akin to statements previously recognized to receive First Amendment protection, such as remarks about coming after President Lyndon Johnson if the speaker was ever drafted and given a rifle, creating an "industrial concentration camp" of persons in opposition to a political group or shooting individuals in opposition to a political party. *Compare* (PC, 2-4) *to Watts*, 394 U.S. at 705; *Noto*, 367 U.S. at 298. Although the use of a fantastical claim that police cars and courthouses would be incinerated to convey a message of criticism may be viewed as offensive or even ineffective, "the language of the political arena . . . is often vituperative, abusive and inexact." *Watts*, 394 U.S. at 708 (internal citations omitted).

  That this claim was an obvious hyperbolic statement is made clear by the impossibility of parts of the scenario presented and implausibility of the remaining

claims. At least one aspect of the scenario presented was impossible: while the Facebook post noted the Tippecanoe Courthouse as a general target with specific goals of targeting Judges Les Meade and Loretta Rush, Judge Rush could not be specifically targeted by damaging the Tippecanoe Courthouse. *Compare* (PC, 3) *to Biography of Chief Justice Loretta H. Rush* available online at http://www.in.gov/judiciary/citc/3582.htm. Chief Justice Rush, although formerly a judge in Tippecanoe, has been a justice of the Indiana Supreme Court, located in Indianapolis, Indiana, since November 2012. *Biography, supra*; *Indiana Supreme Court website* available at http://www.in.gov/judiciary/supreme/. The Facebook posting on June 19, 2014 therefore relied on a fact that "would never occur" making its conveyance not a threat of actual activity but instead one of the "vehement, caustic or sometimes unpleasantly sharp attacks on government and public officials" that is entailed in unfettered commentary on public issues. *Watts*, 394 U.S. at 707, 708.

The remaining statements are also of the "loud but . . . puny" variety made serious only by their prosecution. *Brandenburg*, 395 U.S. at 454 (Douglas, J., concurring). The bold claims that the group can with ease "incinerate and destroy" and blow to pieces a courthouse reads as hyperbole—the ever-present security at a courthouse coupled with the difficulty of physically destroying any building make this claim, not impossible, but unrealistic and more likely aimed at attention-grabbing. (PC, 3). The statement that the group would "purge" police officers from the land is again an obviously unrealistic goal. (PC, 4).

These statements, made in brazen terms but with little prospect of realization, are the very type of over-the-top and emotion-inciting political criticism recognized as requiring the full protection of the First Amendment. Criticism, in whatever form, "is

the spur of reform" and is steadfastly regarded as essential to our nation's makeup. *Dennis*, 341 U.S. at 549. The First Amendment requires us to accept the path that discourse may take and avoid broad constraints of distasteful expression as "[i]t is better for those who have almost unlimited power of government in their hands to err on the side of freedom." *Id*.

As the words and their context reveal that Mr. Bradbury's statement is protected speech as a matter of law, this Court must dismiss the Indictment against him.

## IV. Conclusion

WHEREFORE, the Defendant respectfully requests that this Court dismiss the Indictment to avoid the unconstitutional overreach of 18 U.S.C. §844(e) and to preserve the rights guaranteed by the First Amendment.

Date:  December 19, 2014

>	Respectfully submitted,
>
>	Northern District of Indiana
>	Federal Community Defenders, Inc.
>
>	By:	s/Viniyanka Prasad
>		Viniyanka Prasad
>		31 East Sibley Street
>		Hammond, IN   46320
>		Phone:  (219) 937-8020
>		Fax:  (219) 937-8021

## CERTIFICATE OF SERVICE

  I hereby certify that, on <u>December 19, 2014</u>, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

    Susan L. Collins
    Susan.l.Collins@usdoj.gov


        <u>s/Viniyanka Prasad</u>